**In re CBI HOLDING COMPANY, INC., et al., Debtors,**

**Ernst & Young and Ernst & Young, LLP, Appellants,**

v.

**Bankruptcy Services, Inc., Appellee.**

**Bankruptcy No. 94–B–438129(BRL).**
**No. 01–CIV–0131 (KMW).**

United States District Court, S.D. New York.

June 30, 2004.

Andrew L. Frey, Mayer, Brown, Rowe & Maw LLP, David Michael Hillman, Mayer, Brown, Rowe & Platt, Harry Simeon Davis, Schulte, Roth & Zabel LLP, New York City, for Ernst & Young, Ernst & Young LLP.

Arthur Steinberg, Robert B. Bernstein, Jay G. Strum, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for Bankruptcy Services, Inc.

## OPINION & ORDER

KIMBA M. WOOD, District Judge.

Ernst & Young and Ernst & Young, LLP (collectively, "Ernst & Young") appeal from a judgment of the United States Bankruptcy Court (Burton R. Lifland, Judge) in an adversary proceeding. The bankruptcy court found Ernst & Young liable for breach of contract, negligence, negligent misrepresentation and fraud in connection with Ernst & Young's pre-petition auditing of the financial statements of a company that petitioned for bankruptcy.

The bankruptcy court entered judgment against Ernst & Young for approximately $70 million, and expunged Ernst & Young's $210,850 Proof of Claim against the company.

For the reasons set forth below, the Court affirms in part and reverses in part the decision of the bankruptcy court. The Court does not now remand this action to the bankruptcy court, but rather orders the parties to submit additional briefing.

### I. Factual Background

The following facts are derived from the bankruptcy court's April 5, 2000 decision regarding liability, see In re CBI Holding Co., 247 B.R. 341, 364–65 (Bankr.S.D.N.Y. 2000), and from the record on appeal. The Court takes from the record on appeal only those facts that are consistent with the bankruptcy court's findings and that are uncontested by the parties.

Prior to bankruptcy, CBI Holding Company, Inc., in conjunction with its subsidiaries (collectively, "CBI" or "Debtors"), was a large wholesale distributor of pharmaceutical products. As a wholesale distributor, CBI's business was to purchase pharmaceutical products from manufacturers, and warehouse those products for delivery to entities such as retail pharmacies and hospitals. CBI achieved its size during the early 1990s by pursuing a strategy of growth through acquisition. CBI financed its acquisitions in two ways.

First, CBI borrowed capital from a bank syndicate through a series of lending agreements. The lending agreements limited the amount of money that CBI could borrow, based on a formula dependent upon the inventory and accounts receivable of each CBI subsidiary. The greater the inventory and accounts receivable that conformed to certain eligibility requirements, the more CBI could borrow, up to specified limits. The lenders ensured

CBI's compliance with the limitations in the lending agreements by requiring CBI to submit periodic reports detailing earnings, inventory, and receivables.

Second, CBI acquired capital from Trust Company of the West ("TCW"), which invested in CBI in May 1991 and again in April 1993. In May 1991, TCW invested $20 million in CBI, and received in return $5 million in shares of CBI common stock (48% of all shares) and $15 million in corporate notes. In April 1993, TCW invested an additional $750,000 in CBI, and received a note with a face value in that amount, plus $250,000 worth of shares of common stock.

As a result of the May 1991 investment, TCW acquired various rights, which are set forth in a shareholders agreement dated May 31, 1991 (the "Shareholders Agreement"), and a securities purchase agreement dated May 13, 1991 (the "Securities Agreement"). Pursuant to the Shareholders Agreement, TCW had the right to select two of the five members of CBI's board of directors and one of the three members of the board's audit committee. CBI's president and CEO, Robert Castello ("Castello"), held the remaining 52% of shares of CBI common stock. With that share of ownership, Castello had the right to select the remaining members of the board of directors and the audit committee. TCW also received certain contingent rights to take control of CBI. Pursuant to the Shareholders Agreement, TCW had the right to take control of CBI in the event of the occurrence of a "control triggering event." The Shareholders Agreement defined control triggering events to include (1) a breach of the earnings to fixed charge ratio specified in the Securities Agreement, and (2) a failure to pay principal on TCW's corporate notes, whether such payment was due at maturity or by reason of acceleration. TCW had

the right to accelerate payment on its notes, pursuant to the Securities Agreement, in the event of a failure by CBI to comply in any material respect with certain covenants in the Securities Agreement. Those covenants established the earnings to fixed charge ratio and included a prohibition against certain transactions, including loans to CBI's officers.

The compensation agreement between Castello and CBI provided for a bonus payment for Castello that was tied to CBI's earnings. Castello received a bonus for fiscal year 1992 that was tied to fiscal year 1992 earnings. Castello also caused a portion of his bonus for fiscal year 1993 to be paid to him before it was due.

In fiscal years 1992 and 1993, CBI's management, including Castello, participated in the misrepresentation of CBI's inventory, the misrepresentation of the age of certain of CBI's receivables, and the intentional failure to record certain of CBI's liabilities.

Ernst & Young was the pre-bankruptcy accounting firm for Debtors. Ernst & Young issued unqualified audit opinions with respect to Debtors' financial statements for fiscal years 1992 and 1993. Ernst & Young issued its fiscal year 1992 opinion on August 6, 1992, and its fiscal year 1993 opinion on October 26, 1993. For each of those years, Ernst & Young's opinions stated, *inter alia*, that Ernst & Young conducted its audit in accordance with Generally Accepted Accounting Standards ("GAAS") and that, in the opinion of Ernst & Young, the consolidated financial statements presented fairly, in all material respects, the financial position of Debtors. In actual fact, the financial statements prepared by Ernst & Young did not present fairly, in all material respects, the financial position of Debtors because Ernst & Young did not detect certain unrecorded liabilities when it performed the fiscal 1992

and 1993 audits. In March 1994, Ernst & Young acknowledged that Debtors' 1993 financial statements were materially inaccurate and withdrew its October 23, 1993 opinion. Also in March 1994, Ernst & Young commenced additional procedures related to the financial statements of CBI for fiscal year 1993 (the "re-audit"). Ernst & Young never completed the re-audit because, in July 1994, CBI directed it to cease all audit-related activities.

## II. Procedural History

### A. The Bankruptcy Proceeding

In August 1994, Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code. In January 1995, Ernst & Young filed a Proof of Claim against CBI in those proceedings in the amount of $210,850 for allegedly unpaid auditing and consulting services (the "Proof of Claim"). The Proof of Claim states that the claim "arises from professional services rendered in 1993 and 1994 on behalf of Debtor in connection with the audit of Debtor's financial statements and other special engagements as described in the attached Exhibits." (RE 780).[1] Those Exhibits are seven invoices dated between May 12, 1994 and August 5, 1994. In June 1995, the Official Committee of Unsecured Creditors of Debtors (the "Creditors' Committee") filed an objection to certain claims filed in Debtors' bankruptcy action, including the claim filed by Ernst & Young. The objection does not allege malpractice but states that it is "without prejudice to the Committee's right to object to the within proofs of claim on other grounds as may be necessary." (Affirmation of Michael L. Schein, dated October 17, 1996 (filed in 96 Civ. 7969) Ex. E, at 9).

By order dated August 23, 1995, the bankruptcy court confirmed the First Amended Joint Plan of Reorganization of Creditors' Committee and Debtors (the "Plan"). In that order, the bankruptcy court appointed Bankruptcy Services, Inc. ("BSI"), the appellee in this action, as the disbursing agent of the Plan. The Plan "provides for the liquidation of all of the Debtors' Assets and the prosecution of various litigations on behalf of the Debtors against third parties (other than the TCW Entities) and the distribution of the net proceeds thereof to the holders of Allowed Claims in accordance with applicable bankruptcy law and this Plan." (RE 795). Under the Plan, Debtors granted to BSI, *inter alia*, "the right to pursue and prosecute ... all adversary proceedings and contested matters pending or thereafter commenced or filed in the Bankruptcy Court or elsewhere, including ... any and all objections to claims." (RE 798). The Plan also provided that Debtors "shall be deemed to have waived and released any and all claims ... against TCW," and that TCW "shall receive an [allowed claim] of $16.7 million," and shall "be deemed to have transferred and assigned to the Disbursing Agent, any and all rights to pursue and prosecute causes of action of any kind held by TCW against any third party, in its capacity as a Creditor or equity security holder of any of the Debtors." (RE 798a).

### B. The Adversary Proceeding

On October 16, 1996, BSI, in its capacity as the Disbursing Agent under the Plan, filed a complaint in bankruptcy court against Ernst & Young (the "Adversary Proceeding"). On October 25, 1996, the

---

1. References to "RE" are references to portions of the record in this action (the "Record Excerpts") submitted by Ernst & Young. By order dated January 24, 2002, this Court permitted BSI to supplement Ernst & Young's Record Excerpts and to submit a brief that references those excerpts by February 1, 2002. No supplement was ever submitted.

Creditors' Committee and BSI entered into an assignment under which the Creditors' Committee expressly assigned to BSI its "right, title and interest to pursue and prosecute all adversary proceedings and contested matters pending as of the Effective Date of the Plan or thereafter commenced or filed in the Bankruptcy Court or elsewhere including, without limitation, the Litigations and objections to claims, inclusive of the Objection to the claim of [Ernst & Young]."

On or about October 25, 1996, BSI filed an amended complaint, alleging the assignment of Debtors' and TCW's claims against Ernst & Young, and the assignment of the Creditors' Committee's Objection to Ernst & Young's Proof of Claim. The amended complaint concerns professional services rendered by Ernst & Young to Debtors from 1992 to 1994. Specifically, BSI alleges: (1) breach of contract in connection with the fiscal 1992 and 1993 audits; (2) negligence in connection with the fiscal 1992 and 1993 audits; (3) negligent misrepresentation that the fiscal year 1992 and 1993 financial statements were materially accurate and that Ernst & Young conducted the fiscal 1992 and 1993 audits in compliance with GAAS; (4) fraud and/or recklessness in connection with the fiscal 1992 and 1993 audits; (5) fraud and/or recklessness in inducing Debtors to retain Ernst & Young to perform the reaudit; (6) breach of fiduciary duty in failing to make certain disclosures to CBI; and (7) expungement of Ernst & Young's $210,850 Proof of Claim. BSI brought each of these claims as assignee of the claims of Debtors. Had CBI not filed for bankruptcy, the claims of Debtors would belong to Castello (52% shareholder) and

to TCW as an equity holder in CBI (48% shareholder). The Court refers to these claims as "CBI's claims." The second, third, fourth, and fifth claims are also brought by BSI as assignee of the claims of TCW as a creditor of CBI. The Court refers to these claims as "TCW's claims." The bankruptcy court dismissed the breach of fiduciary duty claim by order dated April 21, 1999.

In the amended complaint, BSI alleges damages to CBI in the form of expenditures that would not have been made but for Ernst & Young's misconduct (*e.g.*, Castello's bonuses and base salary, fees for certain acquisitions, and fees paid to Ernst & Young), the loss of Debtors' value as a going concern, and increased losses and/or liabilities incurred after fiscal year 1992. BSI alleges damages to TCW representing TCW's loss with respect to its equity interest in Debtors and its loss with respect to its $15 million note.

Soon after the filing of BSI's amended complaint, Ernst & Young moved to withdraw the Adversary Proceeding from bankruptcy court to this Court. By order dated November 13, 1998 (the "1998 Order"), the Court denied that motion, concluding that the Adversary Proceeding qualified as a "core" proceeding under 28 U.S.C. § 157(b)(2), and specifically as a "counterclaim" under § 157(b)(2)(C) and as a proceeding concerning the "allowance or disallowance of claims against the estate" under § 157(b)(2)(B).[2] *See* 1998 Order, 6–10. The Court based that conclusion on its determination that the Proof of Claim and the claims in the amended complaint "are related, arise out of the same transaction, and a determination of [BSI's]

---

**2.** The Court also found that the claims are core matters under the "catch-all" provisions of § 157(b)(2)(A) ("matters concerning the administration of the estate") and (O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims"). *See* 1998 Order, 10–11.

claims would likely be dispositive of [Ernst & Young's] claims." *Id.* at 7. The Court also held that the interests of judicial economy would be best served by leaving the adversary proceeding in the bankruptcy court, given Judge Lifland's familiarity with the issues and the parties. *See id.* at 11–12.

In December 1998, Ernst & Young moved for reargument and reconsideration of the 1998 Order. While that motion was pending, two other orders relevant to this appeal were issued. First, the bankruptcy court issued an order in May 1999 that, *inter alia,* bifurcated the trial on liability from the determination of damages. Second, in June 1999, Judge Baer, acting in Part I on an application by Ernst & Young, issued an order to show cause that the reference to bankruptcy court for purposes of trial should not be withdrawn. By order dated July 1, 1999, this Court vacated the order to show cause and stated that it would consider Ernst & Young's arguments in support of the order to show cause in conjunction with Ernst & Young's motion for reconsideration.

The Court denied Ernst & Young's motion for reconsideration, by order dated August 13, 1999 (the "1999 Order"). In the 1999 Order, the Court rejected Ernst & Young's argument that the bankruptcy court could not properly hear the claims between TCW and Ernst & Young because they are two, non-debtor, third parties. *See* 1999 Order, 3–4. The Court determined that, because all of the claims asserted by BSI, including those assigned to it by TCW, involved Debtors or Debtors' property, those claims were properly deemed to be core. *See id.* The Court also affirmed its earlier finding, made in the 1998 Order, that BSI's claims constitute counterclaims to Ernst & Young's Proof of Claim, and rejected Ernst & Young's claim that the Creditors' Commit-

tee's assignment was ineffective. *Id.* at 4–5. Finally, the Court concluded that, to the extent the parties were protected by the Seventh Amendment, the bankruptcy court could conduct a jury trial without the consent of the parties. *Id.* at 6–10. The Court did not rule on whether CBI's claims could be tried without a jury.

By order dated September 3, 1999, the bankruptcy court struck Ernst & Young's jury trial demand, finding that Ernst & Young had no right to a jury trial.

After a bench trial on the issue of liability, the bankruptcy court issued its April 5, 2000 decision and granted "judgment" for CBI "on all remaining counts." *In re CBI Holding,* 247 B.R. at 369. The bankruptcy court did not discuss separately each of CBI's six claims and each of TCW's four claims, but instead stated the following conclusions: (1) Ernst & Young departed from GAAS in conducting the fiscal year 1992 and 1993 audits of Debtors' financial statements; (2) Ernst & Young's departure from GAAS was the proximate cause of injury to CBI and TCW; (3) the fact that the accounting fraud was known by Castello and other management employees does not deprive CBI (and BSI acting on CBI's behalf) of standing to assert its claims of auditor malpractice; (4) TCW (and BSI acting on TCW's behalf) has standing to assert both negligence and fraud claims against Ernst & Young; and (5) TCW's claims are not barred by New York General Obligation Law section 15–108(c). In its April 5, 2000 decision, the bankruptcy court did not state any specific conclusion with respect to BSI's claim for expungement of Ernst & Young's Proof of Claim.

By order dated April 18, 2000, the bankruptcy court stated specifically that it had found Ernst & Young liable to BSI on BSI's first through fifth claims, and scheduled trial on damages. After a second

bench trial, the bankruptcy court determined damages of $27,738,603, plus pre-judgment interest of over $17,000,000, with respect to the claims brought by BSI on behalf of CBI, and damages of $15,412,000, plus pre-judgment interest of nearly $10,000,000, with respect to the claims brought by BSI on behalf of TCW. The bankruptcy court found that the appropriate measure of damages suffered by CBI is the difference in the amount for which CBI's equity could have been sold in 1993 and $0 (CBI's value at the time the Plan was entered on August 23, 1995). The bankruptcy court found that the appropriate measure of damages suffered by TCW is the amount TCW would have received on its $15.75 million in notes if CBI had been sold in October 1993. The bankruptcy court thus awarded damages to TCW only as a creditor and not as an equity security holder of CBI.

In its final judgment in this action, dated November 6, 2000, the bankruptcy court stated that, in its April 5, 2000 decision, it "found [Ernst & Young] liable to [BSI] on each of Counts I through V and found that with respect to Count VII that [sic] [Ernst & Young's] proof of claim in the bankruptcy proceeding in the amount of $210,850 should be expunged." The bankruptcy court again did not explain its reasons for expunging the Proof of Claim.

Ernst & Young now appeals the bankruptcy court's decisions concerning liability and damages.

### III. Discussion

In exercising appellate jurisdiction, a district court reviews the bankruptcy court's findings of fact for clear error, and its conclusions of law *de novo*. A court reviews mixed questions of fact and law *de novo*. *See In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir.2003); *In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir.1999).

Ernst & Young raises seven arguments on appeal. First, it renews its argument that BSI's claims are not "core" and thus were not properly within the jurisdiction of the bankruptcy court. Second, it argues that it is constitutionally entitled to a jury trial on BSI's claims against it and that the bankruptcy court improperly struck Ernst & Young's jury trial demand. Third, it contends that the bankruptcy court erred in refusing to impute the wrongdoing of CBI's senior management to CBI. Fourth, it asserts that the bankruptcy court erred in finding that Ernst & Young's alleged malpractice was the legal cause of CBI's and TCW's asserted injuries. Fifth, it challenges the bankruptcy court's findings of negligence and fraud. Sixth, it argues that TCW's claims are barred by New York statute and by TCW not having been in privity with Ernst & Young. And, seventh, it argues that the bankruptcy court erred in its determination of damages.

### A. The Court's Determination that BSI's Claims are Core

The Court has twice ruled that BSI's claims against Ernst & Young are "core" proceedings under the Bankruptcy Code that can be determined by a bankruptcy judge. *See* 28 U.S.C. § 157(b)(1). Ernst & Young does not reargue the jurisdictional issue in this appeal but states its continued objection to the Court's conclusion, and offers to provide plenary argument if the Court decides to revisit the issue. Ernst & Young also sets forth the principal bases for its position that a bankruptcy judge had no jurisdiction to try either the CBI claims or the TCW claims.

The Court declines to entertain a complete reargument of the jurisdictional issue. The Court does, however, take this opportunity to reiterate and further explain its reasons for determining that the CBI claims and the TCW claims are core.

Section 157 of the Bankruptcy Code divides claims in bankruptcy proceedings into two principal categories, "core" and "non-core." *See In re S.G. Phillips Constructors, Inc.,* 45 F.3d 702, 704 (2d Cir. 1995). "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11 . . ., and may enter appropriate orders and judgments, subject to review under section 158 of [title 28]." 28 U.S.C. § 157(b)(1). Bankruptcy judges may hear non-core proceedings "that [are] otherwise related to a case under title 11" but, absent consent of the parties, may only recommend findings of fact and conclusions of law, which are subject to *de novo* review by a district court. 28 U.S.C. § 157(c).

The distinction between core and non-core proceedings derives from the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). *See In re United States Lines, Inc.,* 197 F.3d 631, 636 (2d Cir.1999). In *Marathon,* the Supreme Court struck down portions of the 1978 Bankruptcy Act and held that only Article III judges can adjudicate legal disputes that are not "at the core of the federal bankruptcy power." 458 U.S. at 71, 102 S.Ct. 2858. The Supreme Court ruled specifically that Congress could not constitutionally give a bankruptcy court "the authority to adjudicate a state breach-of-contract action, based on a pre-petition contract, brought by a debtor against a defendant that had not filed a claim with the bankruptcy court." *In re Orion Pictures Corp.,* 4 F.3d 1095, 1100 (2d Cir. 1993).

Congress enacted 28 U.S.C. § 157 in response to *Marathon.* Section 157 provides a non-exclusive list of core proceedings, which includes, *inter alia,* matters concerning the administration of the estate, allowance or disallowance of claims against the estate, counterclaims by the estate against persons filing claims against the estate, and other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship. Both the Second Circuit and the Supreme Court "have concluded that the *Marathon* holding was a narrow one and have broadly construed the jurisdictional grant" in 28 U.S.C. § 157. *In re S.G. Phillips Constructors, Inc.,* 45 F.3d at 705. " '[C]ore proceedings' should be given a broad interpretation that is 'close to or congruent with constitutional limits.' " *In re United States Lines, Inc.,* 197 F.3d at 637 (quoting *In re Best Prods. Co.,* 68 F.3d 26, 31 (2d Cir.1995) (quoting *In re Arnold Print Works, Inc.,* 815 F.2d 165, 168 (1st Cir. 1987))). However, "[a] general rule that . . . proceedings are core [simply] because they involve the property of the estate would 'create[ ] an exception to *Marathon* that would swallow the rule.' " *In re United States Lines, Inc.,* 197 F.3d at 637 (quoting *In re Orion Pictures Corp.,* 4 F.3d at 1102).

In the context of evaluating whether contract[3] actions are core proceedings, the Second Circuit has stated that the determination depends on "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *In re United States Lines, Inc.,* 197 F.3d at 637. The fact that

---

3. Although the present case involves predominantly tort claims, the Court applies by analogy the framework developed by the Second Circuit with respect to contract claims. *Cf.* *In re Iridium Operating LLC,* 285 B.R. 822, 830 (S.D.N.Y.2002) (stating that the test applies equally to contract actions and "non-personal injury tort actions").

an action arises out of a pre-petition contract weighs against that proceeding being deemed "core". *See In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir.2002) (citing *In re United States Lines, Inc.*, 197 F.3d at 637–38). Similarly, the greater the degree of independence between the reorganization and a particular cause of action, the less likely it is that the action will be deemed core. The degree of independence "hinges on 'the nature of the proceeding.'" *In re United States Lines, Inc.*, 197 F.3d at 637 (quoting *In re S.G. Phillips*, 45 F.3d at 707). "Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function." *In re United States Lines, Inc.*, 197 F.3d at 637.

In this case, the Court determined that ten claims against Ernst & Young could be heard by the bankruptcy court, six of which were pursued on behalf of CBI and four of which were pursued on behalf of TCW. Nine out of ten of the claims (that is, all except CBI's expungement claim) are based on events that occurred before Debtors filed for bankruptcy. That factor cuts generally against a finding that the claims are core. Nonetheless, courts commonly find claims to be core based solely on the nature of the claims, despite the fact that those claims are based on prepetition contracts. *See, e.g., In re Petrie Retail, Inc.*, 304 F.3d at 229–231 (holding that a plan consummation motion was core, notwithstanding the fact that it was based on a pre-petition lease); *In re United States Lines, Inc.*, 197 F.3d at 638 (holding that a contract action was core, notwithstanding the fact that it was based on pre-petition contracts). The Court sets forth here a further explanation of its reasons for deciding that all of the claims in this case are core.

### 1. CBI's Claims are Core

CBI's claim for expungement of Ernst & Young's Proof of Claim is unquestionably core because it directly implicates a core bankruptcy function, *i.e.*, the allowance or disallowance of claims against the estate. *See* 28 U.S.C. § 157(b)(2)(B); *In re S.G. Phillips*, 45 F.3d at 705. CBI's five other claims (alleging negligence, breach of contract, and fraud) are core because they are factually and legally interconnected with Ernst & Young's Proof of Claim and CBI's expungement claim. *See In re Iridium Operating LLC*, 285 B.R. at 830–831 (S.D.N.Y.2002) (claims that would otherwise be non-core are rendered core because they arise from the same operative facts as core claims and proofs of claim) (collecting cases).

The degree to which CBI's negligence, breach of contract, and fraud claims are interconnected with the Proof of Claim and expungement claim can be demonstrated by reference to CBI's fraud claim regarding the reaudit work. As Ernst & Young emphasizes in its brief on appeal, its Proof of Claim apparently concerned fees due for services performed in connection with the reaudit.[4] CBI's fraud claim with respect

---

4. When the Court initially considered the core/non-core question, it was unclear what services Ernst & Young claimed in its Proof of Claim were uncompensated. Although the Proof of Claim states that it "arises from professional services rendered in 1993 and 1994," the attached exhibits detailing the services contained only invoices from 1994. Ernst & Young characterizes the Proof of Claim in its papers as having to do solely with the reaudit work (and it appears to be uncontested that the services at issue actually were performed only in 1994). Nonetheless, it is also quite clear that the reaudit work was directly connected to Ernst & Young's 1993 and 1994 audits. For example, a large portion of the work included in the Proof of Claim was apparently a "special review" of

to the reaudit work specifically alleges that CBI was induced to continue to retain Ernst & Young to perform the reaudit work under false pretenses, because Ernst & Young had not revealed its own culpability in failing to detect Debtors' unrecorded liabilities. BSI also argues that Ernst & Young's Proof of Claim essentially charges CBI for Ernst & Young's repetition of audit work that Ernst & Young performed improperly the first time around. The Court finds (as it found when it first considered this issue) that such a claim, if proven, could provide a defense to Ernst & Young's Proof of Claim. *See, e.g., Altamore v. Friedman,* 602 N.Y.S.2d 894, 193 A.D.2d 240, 247 (2d Dep't 1993) ("malpractice is a defense to an action to recover for professional services"); *Bowen v. Merdinger,* 196 Misc. 987, 92 N.Y.S.2d 566, 571 (Sup.Ct.1949) ("if by misrepresentation or suppression of facts, the plaintiffs were induced to enter into the agreement in suit, the agreement is not only voidable and subject to rescission at the instance of the injured party, but the defendant has also forfeited all right to compensation for services rendered").

The Court thus reaffirms its conclusion that CBI's reaudit fraud claim is core, because it would affect the allowance or disallowance of Ernst & Young's Proof of Claim, *see* 28 U.S.C. § 157(b)(2)(B), and states a counterclaim by the estate against a person filing a claim against the estate, *see* 28 U.S.C. § 157(b)(2)(C). Because CBI's remaining claims of negligence, breach of contract, and fraud are based upon the same operative facts as the reaudit fraud claim and the expungement claim, and were filed in response to Ernst & Young's Proof of Claim, which is based on the same set of facts, those claims are

Debtors' financial statements after the discovery of the management fraud.

also deemed core. "A response to a proof of claim which is, in essence, a counterclaim, is a core proceeding under 28 U.S.C. § 157(b)(2)(C)." *See In re Baudoin,* 981 F.2d 736, 741 (5th Cir.1993) (debtor's $4,000,000 contract and tort claims regarding loans were "core" when creditor filed proof of claim based on same loans); *In re Leslie Fay Cos.,* No. 97 Civ. 2244(MGC), 1997 WL 555607, *2 (S.D.N.Y. Sept. 4, 1997) ("The adversary proceeding is nothing more than a counterclaim by Leslie Fay to the proofs of claim filed by the Creditors" and is therefore core).

The Court also rejects Ernst & Young's argument that BSI cannot predicate CBI's claims on § 157(b)(2)(B) (allowance or disallowance of claims) because neither CBI nor BSI objected to Ernst & Young's Proof of Claim under the terms of the Plan. The Court finds that the Creditors' Committee's assignment to BSI of its objection to Ernst & Young's Proof of Claim was effective, in light of the nature, purpose, and terms of the Plan.

### 2. TCW's Claims are Core

■ TCW's negligence and fraud claims are in a slightly different posture than CBI's claims. There is no doubt that TCW's claims are implicated in the claims allowance process to the extent that those claims are factually congruent with the CBI negligence and fraud claims that form the basis of CBI's objection to Ernst & Young's Proof of Claim. However, because Ernst & Young's Proof of Claim was filed solely against CBI, and not TCW, BSI's claim to expunge the Proof of Claim is brought on behalf of CBI alone. TCW's claims cannot, therefore, be core pursuant to § 157(b)(2)(B), because they would not themselves directly affect the allowance or disallowance of the Proof of Claim.[5] To

5. The Court notes that BSI alleges its reaudit fraud claim on behalf of TCW as well as on behalf of CBI. Although TCW may have stand-

the extent the Court did not make this point clear in its previous orders, it does so now.

TCW's claims do, however, qualify as counterclaims by the estate against persons filing claims against the estate. *See* 28 U.S.C. § 157(b)(2)(C). TCW's claims became the property of Debtors' estate under the Plan. Although the claims were deemed "transferred and assigned" to BSI, BSI was acting solely as a disbursing agent for Debtors under the Plan. The assignment to BSI in these circumstances was equivalent to an assignment to the estate. This assignment was not effected solely for the purpose of manufacturing jurisdiction over this adversary proceeding, *cf., In re Maislin Indus., U.S., Inc.,* 66 B.R. 614, 617 (E.D.Mich.1986) (denying motion to amend complaint where assigned claims had no valid business purpose and no clear relationship to the bankruptcy proceeding), but was effected as an integral part of the Plan, which was approved by the bankruptcy court and over which the bankruptcy court retained jurisdiction.

TCW's claims are counterclaims by the estate arising out of the facts that gave rise to Ernst & Young's Proof of Claim. In the unique circumstances of this case, the Court finds that the bankruptcy court had jurisdiction to adjudicate TCW's claims.[6]

The case at hand is distinguishable from certain cases in which courts have found adversary proceedings to be non-core or have granted motions to withdraw references from the bankruptcy court. This case is distinguishable from *Marathon* and *In re Orion Pictures Corp.* because Ernst & Young filed a Proof of Claim in Debtors' bankruptcy proceeding, and BSI's claims are factually and/or legally related to that Proof of Claim. This case is also distinguishable from *In re Complete Management, Inc.,* No. 02 CIV. 1736(NRB), 2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) and *In re 131 Liquidating Corp.,* 222 B.R. 209 (S.D.N.Y.1998), two decisions in which courts in this district granted motions to withdraw references from the bankruptcy court.[7]

---

ing to assert a claim for damages for the alleged reaudit fraud, the Court sees no reason TCW would have standing, whether as a creditor or an equity security holder of CBI, to assert this claim as a defense to Ernst & Young's Proof of Claim for the reaudit work.

**6.** The Court also rejects Ernst & Young's argument that, pursuant to 11 U.S.C. § 1141(b), the estate ceased to exist upon confirmation of the Plan, and that therefore TCW's claims could never have become property of the estate. The terms of the Plan are directly to the contrary. (R.E. 799 (*e.g.,* the bankruptcy court retains exclusive jurisdiction to "ent[er] a final decree closing the Debtors' estates")).

**7.** *In re Complete Management, Inc.* is factually similar to this case to the extent that it concerned a malpractice claim by a debtor against an accounting firm that had filed a proof of claim in the debtor's bankruptcy proceeding. It is factually distinct to the extent that Judge Buchwald had a related securities action pending before her at the time she

considered the accountant's withdrawal motion. Moreover, although Judge Buchwald expressed some skepticism that a counterclaim seeking damages far greater than the related proof of claim could be deemed core, she expressly declined to reach that issue. Instead, Judge Buchwald assumed, *arguendo,* that the adversary proceeding was core, and decided nonetheless to withdraw the reference because other "considerations of efficiency and fairness favor[ed] withdrawal." *In re Complete Management, Inc.,* 2002 WL 31163878, at *3. In this case, at the time Ernst & Young moved to withdraw the reference from the bankruptcy court, considerations of efficiency strongly weighed in favor of not granting that motion.

In *In re 131 Liquidating Corp.,* Judge Cederbaum found that a claim by the debtor's shareholders against three individuals who were principals of a creditor was non-core. She reasoned that the claim was non-core because it "ar[ose] under state common law and involves pre-petition conduct by parties

### B. Ernst & Young's Right to a Jury Trial [8]

Ernst & Young appeals the bankruptcy court's decision that Ernst & Young does not have a Seventh Amendment right to a jury trial. It is well-established that the Seventh Amendment protects the right to a jury trial only for matters at law, "in contradistinction" to those in equity. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830) (Story, J.)). The parties here do not contest that BSI's tort and contract claims in this action are traditionally legal in nature and thus that there is ordinarily a right to have them decided by a jury.[9]

Legal claims cannot be " 'magically converted into equitable issues' merely because they arise out of [the] equitable proceedings" of the bankruptcy court. *Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323, 1329 (2d Cir.1993) (quoting *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). In addition, "the designation of an action as 'core' does not control whether or not the action may be tried before a jury .... [t]he determination that the ... action is 'core' is entitled to minimal weight in reaching our ultimate decision on the jury trial issue." *Germain*, 988 F.2d at 1326. However, certain claims can lose their legal nature, and be converted into claims in equity, if the action in which the claims are brought is "integrally related" to the claims allowance process in bankruptcy. *Granfinanciara*, 492 U.S. at 60, 109 S.Ct. 2782; *Germain*, 988 F.2d at 1329 & 1332. A claim is integrally related to the claims allowance process if it affects the allowance of a creditor's claim filed against the bankruptcy estate. *Id.* at 1327.

Because the filing of a claim against the bankruptcy estate triggers the process of "allowance and disallowance of claims," a creditor who files such a claim subjects itself to the bankruptcy court's equitable jurisdiction. *Granfinanciera*, 492 U.S. at 58, 109 S.Ct. 2782. If that creditor is met with an adversary proceeding, the resolution of which affects the restructuring of debtor-creditor and creditor-creditor relations, then the creditor loses its Seventh Amendment rights, even if the adversary proceeding concerns traditionally legal claims. *Langenkamp v. C.A. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990); *Granfinanciera*, 492 U.S. at 58–59 & 59 n. 14, 109 S.Ct. 2782. If,

---

who have no claim against the debtor," even though the non-core claim "ar[ose] out of the same transaction as [other] core claims." *In re 131 Liquidating Corp.*, 222 B.R. at 211. Although Ernst & Young analogizes its relationship to TCW to the relationship of the individual principals to the shareholders in *In re 131 Liquidating Corp.*, the analogy is inapt. The individual principals in *In re 131 Liquidating Corp.* had not filed any proof of claim in the debtor's bankruptcy proceeding (even though the creditor for whom they were principals had). Here, Ernst & Young has filed a Proof of Claim and, for the reasons stated above, BSI's claims are core.

8. In any action commenced in federal court, the "right to a jury trial ... is to be deter-

mined as a matter of federal law." *Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963) (per curiam). Because the determination of the parties' right to a jury is one of law, the Court reviews the bankruptcy court's decision *de novo*. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir.1992); *In re Bradlees Stores, Inc.*, Nos. 00–16033(BRL), 00–16035(BRL), 00–16036(BRL), 01–CV–3934(SAS), 2001 WL 1112308, *1 (S.D.N.Y. Sept. 20, 2001).

9. Because the parties agree that the claims at issue are legal in nature, the Court need not undertake the analysis set forth in *Granfinanciera* to determine whether the action is legal or equitable. 492 U.S. at 42, 109 S.Ct. 2782.

in contrast, the creditor does not submit a claim against the bankruptcy estate, it has not subjected itself to the bankruptcy court's equitable jurisdiction, and it, therefore, maintains its right to a jury for any claims arising out of the bankruptcy proceeding. *Langenkamp*, 498 U.S. at 45, 111 S.Ct. 330; *Granfinanciera*, 492 U.S. at 58–59, 109 S.Ct. 2782. Accordingly, a creditor's right to a jury trial on traditionally legal claims arising in an adversary proceeding depends on: (1) whether the creditor has filed a proof of claim against the bankruptcy estate, *see Langenkamp*, 498 U.S. at 45, 111 S.Ct. 330 (quoting *Granfinanciera*, 492 U.S. at 58, 109 S.Ct. 2782); and (2) whether the resolution of the proceeding affects the allowance of the proof of claim, *see Germain*, 988 F.2d at 1327.

Ernst & Young has filed a Proof of Claim against the bankruptcy estate; its right to a jury trial thus turns on whether the resolution of BSI's claims affects the allowance of Ernst & Young's Proof of Claim. To make this determination, the Court looks again to the relationship between Ernst & Young's Proof of Claim and the CBI and TCW claims.

### 1. Ernst & Young Does Not Have a Right to a Jury Trial on CBI's Claims

The Court finds that the claims assigned to BSI by CBI are integrally related to the claims allowance process because BSI's success on those claims would result in the disallowance of Ernst

& Young's Proof of Claim. *See id.* at 1330, n. 8 (discussing *In re Frost, Inc.*, 145 B.R. 878, 882 (Bankr.W.D.Mich.1992) (debtor's allegations of prepetition attorney malpractice are "intertwined" with debtor's objection to attorney's proof of claim for fees due, and thus debtor has no right to jury trial in adversary proceeding)). The Court has explained above why all of CBI's claims are integrally related to the allowance of Ernst & Young's Proof of Claim, and will not repeat that explanation here. The Court thus finds that the legal issues relevant to CBI's claims have been "converted to . . . issue[s] of equity" and that Ernst & Young therefore is not entitled to a jury trial on those issues. *See Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1253 (3d Cir.1994) ("allegation of legal malpractice raised as a defense to postpetition fees for bankruptcy counsel . . . falls within the process of the allowance and disallowance of claims . . . [and] debtors have no Seventh Amendment right to trial by jury"); *In re Leslie Fay Cos.*, 1997 WL 555607, at *2 (adversary proceeding instituted by debtor is essentially an objection to the allowance of creditors' claims which also seeks affirmative relief, thus creditors have no right to a jury trial of adversary proceeding).[10]

### 2. Ernst & Young Does Have a Right to a Jury Trial on TCW's Claims

In contrast to CBI's claims, TCW's claims do not "bear[ ] directly on the allowance of [Ernst & Young's]

---

**10.** Ernst & Young also argues that the Seventh Amendment must apply to CBI's claims because (1) those claims seek affirmative relief far in excess of Ernst & Young's Proof of Claim, and (2) Ernst & Young could not possibly have foreseen that it would relinquish its right to a jury trial by filing the Proof of Claim. The Court rejects these arguments. The determination of whether a party is protected by the Seventh Amendment turns neither on the scope of potential damages nor on

a party's willful surrender of its Seventh Amendment right; rather, that determination turns on whether the party's claim is integrally related to the claims allowance process. *See Granfinanciera*, 492 U.S. at 60, n. 14, 109 S.Ct. 2782 ("once a creditor has filed a claim against the estate, the bankruptcy trustee may recover the full amount of any preference received by the creditor-claimant, even if that amount exceeds the amount of the creditor's claim"); *Germain*, 988 F.2d at 1329.

claims." *Germain,* 988 F.2d at 1329. TCW's claims are for money damages for the alleged, separate and distinct injury sustained by TCW as a creditor of CBI. These claims are not "integrally related" to Ernst & Young's Proof of Claim because that Proof of Claim is against Debtors' bankruptcy estate, not against TCW as a creditor. Even though success on TCW's claims may augment the size of the bankruptcy estate, it will not affect BSI's ability to defend against Ernst & Young's Proof of Claim. *See Germain,* 988 F.2d at 1327 ("If [the bankruptcy trustee] wins, the estate is enlarged, and this may affect the *amount* the [creditor] and its fellow creditors ultimately recover on their claims but it has no effect whatever on the *allowance* of [the creditor's] claims") (emphasis in original). BSI cites to no decision, and the Court has found none, in which a creditor that has filed a proof of claim against the estate is denied the right to a jury trial on the claims of a third party creditor. Unlike the claims asserted by a trustee or other party standing in a debtor's shoes, *see, e.g., Langenkamp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343, *Granfinanciera,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26, and *Germain,* 988 F.2d 1323, TCW's claims simply do not affect the allowance of Ernst & Young's Proof of Claim. Accordingly, Ernst & Young has a Seventh Amendment right to a jury trial on the claims assigned by TCW in its role as a creditor. It is of no consequence in determining whether Ernst & Young forfeited its right to a jury trial on TCW's claims that Ernst & Young forfeited its right to a jury trial on CBI's claims. *Cf. Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'Ship,* Nos. 04 Civ. 708(GEL), 04 Civ. 709(GEL), 04 Civ. 710(GEL), 2004 WL 1048239, at *6 (S.D.N.Y. May 7, 2004) (although plaintiffs may have jeopardized their right to a jury trial against a bankrupt defendant by filing proofs of claim

against the bankrupt's estate, plaintiffs' right to a jury trial on their claims against other defendants against whom they had not filed proofs of claim is unaffected).

■■■ The Court has already determined, in the 1999 Order, that the bankruptcy court has the power to conduct a jury trial. Although a remand for a jury trial on TCW's claims may "impede swift resolution of bankruptcy proceedings and increase the expense of Chapter 11 reorganizations," the Court finds that " 'these considerations are insufficient to overcome the clear command of the Seventh Amendment.' " *Granfinanciera,* 492 U.S. at 63, 109 S.Ct. 2782 (citing *Curtis v. Loether,* 415 U.S. 189, 198, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)).

Nevertheless, because Ernst & Young argues that it is entitled to judgment against both CBI and TCW on various other grounds, which would negate the need for a new trial on any claims protected by the Seventh Amendment, the Court turns to Ernst & Young's other arguments before deciding whether to remand some, or all, of the claims against Ernst & Young for a jury trial.

*C. BSI's Standing*

*1. Standing to Assert CBI's Claims*

BSI asserts claims for fraud, negligence, and breach of contract, as assignee of the claims of the company (*i.e.,* the shareholders).

Ernst & Young appeals the bankruptcy court's decision not to impute the wrongdoing on the part of CBI's management to CBI. Ernst & Young raises the issue of imputation as part of an *in pari delicto* defense. However, because this issue also affects the determination of BSI's standing to assert CBI's claims, the Court considers imputation, as a threshold matter, in terms of standing. *See Steel Co. v. Citizens for a*

*Better Environment*, 523 U.S. 83, 94–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that an Article III court cannot decide the meaning or constitutionality of a state or federal law if the plaintiff does not have standing); *see also Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 212 B.R. 34, 36 n. 1 (S.D.N.Y.1997); *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 362 (Bankr.S.D.N.Y.2002) ("Some courts view *in pari delicto* as a question of standing, while others treat it as an equitable defense.") (citations omitted). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Accord Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir.1991). A party that does not have standing lacks a "personal stake in the outcome of the controversy" and thus fails to meet the case or controversy requirement of Article III of the Constitution. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■■■ The Bankruptcy Code places a trustee in the shoes of the bankruptcy estate. Thus, a trustee has standing to bring any suit that the bankrupt corporation could have brought had the corporation not filed a petition for bankruptcy. *See* 11 U.S.C. §§ 541 & 542; *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 99–100 (2d Cir.2003) (citing *Wagoner*, 944 F.2d at 118). In this appeal, BSI is not a bankruptcy trustee, but it is in a position analogous to the position of a trustee. Both BSI and the typical trustee sue in the shoes of the bankrupt's estate. Thus, by analogy, BSI has standing to institute any suit that Debtors could have instituted had they not filed a petition for bankruptcy. *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 80 (2d Cir.2000) (analogizing the posi-

tion of the trustee to that of a party suing on behalf of the debtor); *In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir.1997) (same).

Whether BSI has standing to assert CBI's claims in contract, negligence or tort, or whether the right to sue on those claims belongs to Debtors' creditors, is determined by state law. *See id.* at 825. In its April 5, 2000 decision, the bankruptcy court discussed BSI's standing to raise CBI's claims without distinguishing the nature of claims. *See In re CBI Holding*, 247 B.R. at 364–65. The Court here considers BSI's standing to assert, first, CBI's claims for fraud, second, CBI's claims for negligence, and, third, CBI's claim for breach of contract.

### a. CBI's Fraud Claims

CBI's fraud claims against Ernst & Young relate to Ernst & Young's (1) fraud and/or recklessness in conducting the fiscal 1992 and 1993 audits, and (2) fraud and/or recklessness in inducing CBI to retain Ernst & Young to perform the reaudit. There is no dispute among the parties that members of CBI's management knew of, purposely did not record, and sought to conceal from Ernst & Young, certain of CBI's liabilities. *See, e.g.*, RE 107–12, 983 & 1253–54.

■■■ In *Wagoner*, the Second Circuit declared that a "claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Wagoner*, 944 F.2d at 120. *Accord Wight*, 219 F.3d at 86; *In re Mediators*, 105 F.3d at 826; *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995). Thus, a bankruptcy trustee, and anyone who similarly stands in the shoes of the bankrupt corporation, generally does not have standing to raise those claims. *See In re Bennett Funding Group*, 336 F.3d at 99–100.

This rule, which has come to be known as the *"Wagoner* rule," is derived from fundamental principles of agency law. The law of agency relies on certain presumptions that regulate the responsibility of a principal for the acts of his agent. The law of agency presumes that when an agent acquires knowledge while acting within the scope of his agency, that knowledge will generally be disclosed to his principal. *See Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936) ("The presumption of communication [of the agent's knowledge] is a pure fiction, contrary to the fact, for it is only when the agent has failed to communicate his knowledge that any occasion arises for imputing it to the principal."). The presumption that an agent communicates such knowledge results from an attempt to balance factors that favor imputing an agent's knowledge to his principal (*i.e.,* the principal has control over the agent, the principal should be incentived to monitor the agent, and the principal chooses to use an agent as his link to the outside world) and factors that disfavor imputing the agent's knowledge to his principal (*i.e.,* agency would fall into desuetude if imputation had no bounds).

It is undisputed that various members of CBI management, including Castello, committed acts of fraud that were not discovered by Ernst & Young during its fiscal 1992 and 1993 audits. If the acts of those individuals, and the knowledge of the fraud possessed by those individuals, can be imputed to CBI itself, CBI (and, hence, BSI, insofar as BSI stands in CBI's shoes) lacks standing to sue Ernst & Young for aiding and abetting the fraud. The acts of fraud will be imputed under the *Wagoner* rule, and principles of agency law, unless some exception to the rule applies.[11]

*i. The "Adverse Interest" Exception*

Courts have long recognized an "adverse interest" exception to the *Wagoner* rule (the *Wagoner* rule, as stated above, presumes that an agent's knowledge will be communicated to his principal, and thus imputes the agent's knowledge to the principal). The "adverse interest" exception to *Wagoner's* rule of imputation provides that when an agent is "committing a fraud for his own benefit," and has "totally abandoned" his principal's interest, the acts of the agent will not be imputed to the principal, and the claim against a third party for defrauding the corporation will remain with the corporation, and not be transferred to the creditors. *In re Bennett Funding Group,* 336 F.3d at 100 (citing *Wight,* 219 F.3d at 87). The adverse interest exception is a narrow one; for it to apply, "the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes." *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985). *Accord In re Bennett Funding Group,* 336 F.3d at 100 (citing *In re Mediators,* 105 F.3d at 827).

The adverse interest exception is entirely consistent with the principles of agency law explained above. Normally, courts will impute the knowledge of an agent acting within the scope of his agency to his

---

**11.** BSI asserts that Ernst & Young aided and abetted the fraud perpetrated by management in that Ernst & Young knowingly and/or recklessly prepared CBI's audits. The distinction between a claim for fraud arising out of a third party's alleged cooperation with management, and a claim for fraud arising out of a third party's alleged aiding and abetting management, is immaterial for purposes of application of the *Wagoner* rule. *See Hirsch,* 72 F.3d at 1094 (bankruptcy trustee lacks standing to sue third party for *cooperating with* management in perpetrating the Ponzi scheme); *Wagoner,* 944 F.2d at 119–20 (bankruptcy trustee lacks standing to sue third party for *aiding and abetting* the scheme of the president and sole shareholder).

principal, because courts presume that such an agent communicates that knowledge to his principal. The practice of *presuming* the transfer of knowledge, and thus *imputing* the agent's knowledge to the principal, is a fiction necessitated by the compromise addressed above. That fiction is untenable, however, when an agent has *totally abandoned* the interests of his principal, and acted *entirely* in his own or a third party's interest, because an agent "cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Center*, 66 N.Y.2d at 784, 497 N.Y.S.2d 898, 488 N.E.2d 828.

■ The bankruptcy court's decision states a number of times that the segment of management involved in the fraud was acting in its own interest and not acting in CBI's interest. The bankruptcy court stated, specifically, that the purpose of the fraud was to obtain a bigger bonus for Castello, and to preserve Castello's personal control over CBI. *See In re CBI Holding*, 247 B.R. at 365. These statements (made among the bankruptcy court's findings of law) support the bankruptcy court's conclusion that the adverse interest exception applies, and that imputation is therefore inappropriate. However, in its findings of fact, the bankruptcy court suggested (perhaps inadvertently) that there existed at least one purpose for the fraud other than to obtain a bigger bonus for Castello, and to preserve Castello's personal control over CBI: The bankruptcy court stated in its findings of fact

that "[a] *principle* [sic] reason why ... members of management caused liabilities to remain unrecorded at year-end was *not for any corporate purpose* but rather to ensure that Castello received the maximum bonus and remained in control." *Id.* at 360 (emphases added). This language leaves open the possibility that the bankruptcy court found that some corporate purpose was served by the fraud. If the Court determines that it is necessary and appropriate to remand the action to the bankruptcy court for further proceedings related to CBI's claims, the bankruptcy court should clarify whether *any* corporate purpose was served by the fraud, or whether the corporation's interests were "totally abandoned" by managers acting "entirely" for their own or another's interest. *Center*, 66 N.Y.2d at 785, 497 N.Y.S.2d 898, 488 N.E.2d 828. *Accord Wight*, 219 F.3d at 87; *In re Mediators*, 105 F.3d at 827.

The Court notes that whether managers have acted entirely in their own interests can be difficult to determine in the corporate setting, where a manager's fortune may depend upon the corporation's short-term fortune, and thus the manager may fraudulently manipulate corporate affairs in a way that causes short-term benefits to accrue to the corporation, for the sole purpose of receiving higher remuneration himself. Moreover, the Court is not convinced that the purpose behind management's conduct should be dispositive of the issue.[12] Nevertheless, the Court is bound by New York law as described above.

---

**12.** In *Cenco Inc. v. Seidman & Seidman*, Judge Posner analyzed both the difficulties in assessing a manager's motives, and the broader question of whether those motives should be dispositive of any claim brought by a company whose managers contributed in defrauding the company. *See Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453–57 (7th Cir. 1982). In *Cenco*, management accomplished

both self-aggrandizement and corporate-aggrandizement by inflating inventories far above value, which caused a rise in the company's stock price, and enabled the company to borrow at lower rates, and to recover inflated insurance proceeds. Analyzing that scenario under Illinois law, the *Cenco* Court found that the question of whether the corporation had a cause of action turned on wheth-

### ii. The So–Called Innocent Insider Exception

█ The bankruptcy court's decision to apply the adverse interest exception to CBI's claims was not its primary justification for declining to impute management's fraudulent conduct to the company. The primary justification was that at least one decision-maker among CBI's stockholders (*i.e.*, TCW), and at least one decision-maker on CBI's board of directors (*i.e.*, Frank Pados), were innocent of the fraud, and either would have taken steps to stop the fraud had the fraud been known. *See In re CBI Holding*, 247 B.R. at 365.

In reaching this conclusion, the bankruptcy court appears to have found applicable a second exception to the *Wagoner* rule (*i.e.*, an exception to a presumption of imputation), separate and apart from the adverse interest exception discussed above. Some courts have recognized this second exception, and have referred to it as the "innocent insider" exception. *See Wechsler*, 212 B.R. at 36 (Knapp, J.); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 710 (S.D.N.Y.2001) (Sprizzo, J.); *BDO Seidman*, 49 F.Supp.2d at 650–51 (Preska, J.); *Lippe v. Bairnco Corp.*, 218 B.R. 294, 302 (S.D.N.Y.1998) (Chin, J.).[13] The innocent insider exception, as explained by some courts, and as addressed by the bankruptcy court below, focuses not on whether culpable managers totally abandoned the company's interest, but rather on whether some part of management was innocent of the misconduct, unaware of it, and able to prevent it had the misconduct been known.

er the wrongdoers were acting on behalf of the corporation, and that that determination was for the finder of fact.

However, the *Cenco* Court appears to have attempted to refine the law to more closely reflect corporate realities; in order to determine whether acts of fraud committed by management should be imputed to the company when the fraud benefits both the managers and the company, and harms only outsiders, the court did not focus on the intent of the managers who were committing the fraud (*i.e.*, whether the managers had totally abandoned the company's interest, and were acting entirely on their own behalf, unconcerned that their acts of fraud had the effect of simultaneously benefitting the company). Rather, Judge Posner considered the traditional objectives of tort liability, which are to compensate victims and deter future wrongdoing. *See id.* at 455. Judge Posner pointed out that a corporation is merely a legal fiction, and that, if a corporation recovers as a victim of an auditor's "laxity," it is the stockholders as of the date of judgment who will benefit from any judgment. However, as explained by Judge Posner, it is unfair for those stockholders to recover if they include: the corrupt officers *themselves*; the stockholders who were responsible for the lax corporate management (by electing a lax board of directors); or the stockholders who bought after the fraud was unmasked, and who, therefore, lost nothing. *Cenco* suggests that courts should focus on who bore the "primary costs" of the fraud—stockholders, or outsiders to the corporation—rather than on the purpose behind the fraud.

The *Cenco* Court did not choose among the various tests that it articulated (*e.g.*, whether wrongdoers were acting on behalf of the corporation; who bore the costs of the wrongdoing; how to deter future wrongdoing), because, under the facts presented, all of the tests for non-recovery were satisfied: the jury (probably) had found that the managers had been acting on *Cenco's* behalf, even though managers were "aggrandized" by the fraud, and even though there were some innocent managers and directors; the primary costs of the fraud were borne by outsiders to the corporation, not by stockholders; and it would be "perverse" to allow either corrupt, lax or uninjured stockholders to recover.

**13.** The innocent insider exception was first articulated by Judge Knapp in the context of a motion to dismiss. *See Wechsler*, 212 B.R. 34. The Court addresses the exception here because the dicta of a number of other decisions suggest that the exception might extend beyond that context. *See Breeden*, 268 B.R. at 710; *BDO Seidman*, 49 F.Supp.2d at 650–51; *Lippe*, 218 B.R. at 302.

The Second Circuit recently discussed the "innocent insider" exception, but decided not to resolve "the question of whether the presence of innocent directors would provide the trustee with standing where fewer than all shareholders are implicated in the fraud." *In re Bennett Funding Group*, 336 F.3d at 101. Instead, the court assumed, *arguendo*, that such an exception exists, but concluded that the prerequisites for its application were absent in the case, because the innocent insiders there were so impotent that they would have been unable to stop the fraud even if they had been aware of it. *Id.*

The rationale behind the innocent insider exception appears to be that, where only some members of management are guilty of the misconduct, and the innocent members could and would have prevented the misconduct had they known of it, the culpability of the malefactors should not be imputed to the company because that imputation would punish innocent insiders (*e.g.*, non-culpable shareholders) unfairly.

This reasoning was rejected by the Seventh Circuit in *Cenco*, which stated that where a publicly traded company has delegated to a board of directors the owners' role of hiring and supervising managers, and where that board has failed to prevent managers from committing fraud, the managers' misconduct should be imputed to the company, so as not to disincentivize the innocent managers, board members, and owners from policing the conduct of the guilty. *Cenco*, 686 F.2d at 454–56. *Accord* Restatement (Third) Agency § 5.03 cmt. b (2002) ("Imputation creates incentives for a principal to choose agents care-

fully and to use care in delegating functions to them."). The Court agrees with *Cenco's* reasoning, and concludes that misconduct by those given authority to make decisions on behalf of a company should be imputed to the company even if innocent members of management could and would have prevented the fraud had they been aware of it. The Court, therefore, declines to adopt any innocent insider exception to the *Wagoner* rule.[14]

### iii. The Sole Actor Rule and the Innocent Insider Exception

Although the Court rejects the innocent insider exception, the Court nonetheless takes this opportunity to address what appears to be substantial confusion evidenced by several courts, including the bankruptcy court below, regarding the nature of the so-called "innocent insider" exception.

As the Court explained above, the bankruptcy court's decision in this case to not impute management's misconduct to the company due to the presence of innocent insiders was made entirely separately from the bankruptcy court's consideration of the "adverse interest" exception to the *Wagoner* rule. That is, first the bankruptcy court declined to impute management's misconduct due to the existence of innocent insiders. Then, the bankruptcy court stated that even if management's wrongdoing should be imputed to the company, CBI would nonetheless have standing because the "adverse interest exception" would apply, given management's apparent total abandonment of the company's interests. *See In re CBI Holding*, 247 B.R. at 365. The Court disagrees with the bank-

---

**14.** The Court's decision not to adopt an innocent insider exception to the *Wagoner* rule is supported by New York law, which provides only a very narrow exception to the general rule that an agent's knowledge and conduct is imputed to his principal. As already explained, that exception applies if: (1) the cul-
pable agent totally abandons his principal's interests; and (2) the culpable agent(s) are not the sole shareholder(s) (in which case, the agent and the principal are one). *Center*, 66 N.Y.2d at 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828.

ruptcy court's analysis of the interaction between the *Wagoner* rule, the adverse interest exception, and the so-called innocent insider exception.

The key flaw in the analysis is that the primary question to be addressed when considering the fiction of imputation is whether the knowledge of the agent that is to be imputed to the principal was gained within, or outside of, the scope of agency. Even when an agent is defrauding his principal, unless the agent has totally abandoned the interests of the principal and is acting entirely in his own, or another person's, interest, that agent is acting within the scope of his agency. Thus, unless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exists; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders.

■■■ When an agent has acted outside of the scope of his agency, however, his acts will nevertheless be imputed to the principal "where the principal and agent are one and the same." *In re Bennett Funding Group*, 336 F.3d at 100 (citation and quotation marks omitted). This exception to the adverse interest exception, styled the "sole actor rule," operates most clearly in the context of a corporation owned and managed by a single person. When that person, in his role as a manager, defrauds the corporation in order to benefit only himself, he has acted outside of the scope of his agency; technically, the agent's fraudulent actions should not be imputed to the company pursuant to the "adverse interest" exception. However, it would be nonsensical to refrain from imputing the agent's acts of fraud to the corporation, despite the agent's total abandonment of the corporation's interests, because the agent is identical to the corpora-

tion. *See In re Mediators,* 105 F.3d at 827. The same analysis would apply to a corporation owned and managed by multiple people, so long as all of them were involved together in a fraud against the corporation.

■■■ Where only some of a corporation's owners were involved in a fraud in their role as managers, courts consider whether those insiders who were innocent and unaware of the misconduct had sufficient authority to stop the fraud. *See, e.g., In re Bennett Funding Group,* 336 F.3d at 101 (innocent director was "impotent to actually do anything"); *Munroe,* 85 F.2d at 495–96 (innocent members of a bank loan committee were dominated by fraudulent committee member). *Cf. Wechsler,* 212 B.R. at 36 ("the *Wagoner* rule only applies where *all relevant* shareholders and/or decisionmakers are involved in the fraud") (emphasis added to the word "relevant"). When the innocent insiders lack authority to stop the fraud, the "sole actor" exception to the "adverse interest" exception applies, and imputation is thus proper, because all *relevant* shareholders and decisionmakers were involved in the fraud. However, when the innocent insiders possessed authority to stop the fraud, the "sole actor rule" does not apply, because the culpable agents who had totally abandoned the interests of the principal, and were thus acting outside of the scope of their agency, were not identical to the principal.

### b. CBI's Negligence Claims

■■■ CBI's negligence claims against Ernst & Young relate to Ernst & Young's (1) negligence in connection with the fiscal 1992 and 1993 audits, and (2) negligent misrepresentation that the fiscal 1992 and 1993 audits were materially accurate, and were conducted in compliance with GAAS.

The *Wagoner* rule does not necessarily govern CBI's negligence claims, because the right to sue for fraud and the right to sue for negligence inhere in different entities. As already explained, under New York law as stated in the *Wagoner* rule, where a third party defrauded the corporation with the cooperation of management, the right to sue the third party for fraud generally accrues to the creditors, not to the corporation itself. By contrast, where a third party has committed negligence, the right to sue the third party for that negligence accrues to the corporation itself. *See, e.g., Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 95 N.Y.2d 702, 711–12, 723 N.Y.S.2d 750, 746 N.E.2d 1042 (2001); *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). Indeed, under New York law, a negligence claim against an accountant belongs *only* to the corporation-client, except where there is sufficient privity between the accountant and a third party, non-client (*e.g.*, a creditor of the client). *Id.* (setting forth standard for cause of action by third party against accountant). Accordingly, the right to sue Ernst & Young for any negligence belonged to CBI and to any third party creditor with sufficient privity to Ernst & Young.

The question arises whether CBI's committing the fraud strips it of standing to sue Ernst & Young for negligence. There is some support for the proposition that CBI lacks standing to sue Ernst & Young for its negligence, due to CBI's own fraudulent actions. For example, in *Cenco*, Judge Posner reasoned that "breach of contract, negligence, and fraud, when committed by auditors, are a single form of wrongdoing under different names." *Cenco*, 686 F.2d at 453. Based on that reasoning, Judge Posner found that a company that lacked standing to sue its accountant for fraud (on the ground that the company itself was involved in the fraud) also lacked standing to sue its accountant for negligence.

The Second Circuit has adopted a more expansive view than that articulated in *Cenco* of the circumstances in which a company has standing: A bankruptcy trustee has standing to assert claims other than fraud claims against a third party where the facts giving rise to those claims are distinct from any facts concerning any participation by the third party in management's fraud. That standard is supported by the logic underlying both *Wagoner*, 944 F.2d 114, and *Hirsch*, 72 F.3d 1085. In *Wagoner*, the Second Circuit found that, although the bankruptcy trustee could not sue the company's broker for fraud, the trustee could sue the company's broker in contract for churning the company's account. *Wagoner*, 944 F.2d at 119. *Wagoner's* finding was based on the fact that churning may form the basis for a cause of action in contract, and that the broker's alleged churning was "clearly distinct" from the broker's alleged participation in management's fraud. *See Hirsch*, 72 F.3d at 1094 n. 6 (discussing *Wagoner's* finding that the trustee had standing on the churning claim). *Accord Wagoner*, 944 F.2d at 119. By way of contrast, in *Hirsch*, the allegations giving rise to the malpractice claim (which was not based in fraud) were "closely tied" to the allegation that defendants had participated in management's fraud. *Hirsch*, 72 F.3d at 1089–90 & 1094 n. 6. Thus, the *Hirsch* court held that the trustee lacked standing to bring the malpractice claim on behalf of the company against the defendant accountants and law firms.[15] *See also In re Bennett*

---

**15.** Significantly, by ruling that the trustee lacked standing to sue the defendant accountants and law firms for malpractice, the *Hirsch* panel did not absolve those defendants of

*Funding Group,* 336 F.3d at 100 (applying the *Wagoner* rule to bar the trustee's professional malpractice claims, where the third-party professionals were allegedly complicit in the fraud). Even so, the *Hirsch* court recognized that if the trustee could establish "some independent financial injury to the [debtor company] ... as a result of the alleged professional malpractice," the trustee could have standing to sue a third party on a claim other than fraud, even where the trustee lacked standing to sue for fraud. *Hirsch,* 72 F.3d at 1094.

Applying that standard here, the Court finds that the allegations giving rise to CBI's claims premised on negligence are clearly distinct from the allegations premised on management's fraud. BSI here does not allege that Ernst & Young participated in the fraud perpetrated by CBI's culpable officials. Indeed, BSI does not dispute that those officials attempted to conceal the fraud from Ernst & Young. Rather, BSI alleges that Ernst & Young is independently at fault for committing errors in auditing CBI. According to BSI's negligence claims, a reasonable accountant would not have made the auditing errors that Ernst & Young made, even if the culpable CBI officials had tried to hide their fraud from that (reasonable) accountant. BSI thus has asserted that CBI was injured (in a legally cognizable way) by

Ernst & Young's performance of the audits. Accordingly, BSI has standing to assert CBI's claims for negligence.[16]

The Court's conclusion that BSI has standing to assert CBI's negligence claims (despite the fact that CBI contributed to its own injuries) is consistent with New York law. New York law employs a comparative negligence analysis, in which a plaintiff's contributory fault (*e.g.,* CBI's fraud) does not bar the plaintiff's recovery against a defendant who caused some of the plaintiff's injuries. N.Y. C.P.L.R. § 1411; 1A Pattern Jury Instructions 2:36 intro. stmt. (3d ed.2004). Rather, under New York's scheme, the recovery accorded to a plaintiff that is partially at fault for its own injuries may be diminished in proportion to the plaintiff's fault. *See id.;* 1B Pattern Jury Instructions 2:154 cmt. (3d ed.2004). *See also Hall & Co. v. Steiner & Mondore,* 147 A.D.2d 225, 227–28, 543 N.Y.S.2d 190 (N.Y.App.Div.1989) (plaintiff alleging accountant malpractice for accountant's failure to discover irregularities purposely made in plaintiff's books is subject to accountant-defendant's affirmative defense of culpable or negligent conduct); *Craig v. Anyon,* 212 A.D. 55, 208 N.Y.S. 259 (N.Y.App.Div.1925) (same). Thus, under New York law, the fault imputed to CBI as a result of management's fraud does not bar CBI's claims for negligence,

liability. *Hirsch* was decided under Connecticut law, which, unlike New York law, allows a non-client to sue a professional for malpractice, without regard to whether that non-client is in privity with the professional. *Hirsch,* 72 F.3d at 1093.

16. Although the Court's conclusion (that BSI has standing to assert CBI's claims for negligence) is different from the conclusion reached by the Seventh Circuit in *Cenco,* the Court's conclusion nevertheless achieves the objectives underlying tort liability, articulated in *Cenco.* In *Cenco,* Judge Posner explained those objectives as two-fold: "to compensate

the victims of wrongdoing and to deter future wrongdoing." *Cenco,* 686 F.2d at 455. Holding Ernst & Young liable for any wrongdoing to CBI both compensates CBI for any injury caused therefrom and deters accountants from performing negligent audits. Indeed, if BSI did not have standing to assert CBI's negligence claims, then any negligence on the part of Ernst & Young would go unpunished, and auditors would not be deterred from performing negligent audits, unless creditors with sufficient privity to the auditors could be found.

and BSI has standing to assert those claims on behalf of CBI.[17]

### c. CBI's Contract Claims

There can be no question that, if CBI's management had not defrauded the company, New York law would accord CBI the right to sue Ernst & Young for the alleged breach of contract. The allegations giving rise to the claims for contractual breach are analogous to the allegations giving rise to the claims for negligence. Based on the logic articulated above with respect to the negligence claims, the Court finds that BSI has standing to assert CBI's claims for breach of contract.

### 2. Standing to Assert TCW's Claims

■ In addition to asserting the above claims on TCW's behalf as a shareholder of CBI, BSI asserts claims for fraud and negligence as assignee of TCW's claims made in TCW's capacity as creditor. As explained above, "a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors...." *Wagoner*, 944 F.2d at 120. Accordingly, TCW, as a creditor of CBI, has standing to assert fraud claims against Ernst & Young.

■ With respect to TCW's claims for negligence, under New York law, an accountant generally cannot be held liable to third parties for the negligent performance of an auditing contract between the accountant and his client. *See Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992); *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). However, a negligent accountant can be held liable to a third party if: (1) the accountant was aware that his financial reports were to be used for a particular purpose; (2) a known third party was intended to rely on the financial reports in furtherance of that purpose; and (3) some conduct on the part of the accountant links the accountant to the third party and shows that the accountant understood that the third party relied on the accountant. *Id.* at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110. These "indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed accountants...." *Security Pacific*, 79 N.Y.2d at 702–03, 586 N.Y.S.2d 87, 597 N.E.2d 1080.

■ Applying this test (the "*Credit Alliance* test"), the bankruptcy court here concluded that the relationship between Ernst & Young and TCW sufficiently approached actual privity for TCW to have a claim against Ernst & Young. *In re CBI Holding*, 247 B.R. at 365–66. Given that the Court has concluded that Ernst & Young has a right to a jury trial with respect to TCW's claims, the disputed facts pertaining to the *Credit Alliance* test must be put before a jury.[18] The Court

---

17. The Court recognizes that other decisions in this district have applied the *Wagoner* rule to preclude a trustee from asserting negligence claims in the context of corporate fraud. *See Breeden*, 268 B.R. at 709; *Brown v. Deloitte & Touche, LLP*, 1999 WL 269901, *2 (S.D.N.Y. May 4, 1999); *Wechsler*, 212 B.R. at 36. Those decisions are distinguishable from the instant action on their facts, and the Court respectfully declines to apply to the facts before it any principles adopted in those decisions.

18. The law is unclear as to whether the Court should address TCW's negligence claims as a matter of standing or as failure to state a claim. *Contrast, e.g., Hirsch*, 72 F.3d at 1093 (referring to standing under Connecticut law), *with BDO Seidman*, 49 F.Supp.2d at 654 (considering the issue under the jurisprudence for failure to state a claim). This distinction is immaterial in the instant appeal and the Court, therefore, does not consider it. If, on remand, the bankruptcy court concludes that this question is properly consid-

thus reverses the bankruptcy's court's determination that BSI possessed standing to assert TCW's negligence claims.

### D. Affirmative Defense (against TCW's claims)

 Ernst & Young contends that BSI is precluded from asserting TCW's claims under New York's General Obligations Law, which provides that "[a] tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person." N.Y. Gen. Oblig. L. § 15–108(c). Under the Plan, TCW obtained a release from liability to CBI and to CBI's other creditors for TCW's role, if any, in CBI's demise. *See* RE 799a (releasing TCW "from any and all claims"). Pointing to that release, Ernst & Young asserts that TCW cannot now seek contribution from Ernst & Young. New York law defines the term "contribution" as a claim that may be made among two or more persons who are "subject to liability for damages for the same ... injury to property...." N.Y. C.P.L.R. § 1401.

The Court finds that TCW's claims against Ernst & Young are not claims for "contribution" because those claims do not arise from the "same injury" as the injuries for which TCW obtained a release. TCW obtained a release from any liability arising out of the injuries to CBI and to CBI's other creditors. TCW does not now seek contribution from Ernst & Young concerning those injuries. Rather, TCW seeks damages for the injuries suffered by TCW itself. TCW's injuries are factually related to the injuries suffered by CBI and by CBI's other creditors, but TCW's injuries, nevertheless, are separate and distinct. *See, e.g., Cresswell v. Warden,* 164 A.D.2d 855, 856, 559 N.Y.S.2d 361

(N.Y.App.Div.1990) ("It is the fact of liability to the same person for the same harm ... which controls.") Accordingly, Ernst & Young's defense against TCW under New York's General Obligations Law, § 15–108(c), is misguided. *See, e.g., Nassau Roofing & Sheet Metal Co. v. Facilities Dev't Corp.,* 71 N.Y.2d 599, 604, 528 N.Y.S.2d 516, 523 N.E.2d 803 (1988) (no claim for contribution where injuries are separate and distinct).

### IV. Conclusion

For the reasons stated above, the Court reiterates its previous holding that all of the claims in this action are core, and further concludes: (1) that Ernst & Young has a right to a jury trial on TCW's claims as a creditor; (2) that BSI has standing to sue Ernst & Young for negligence and breach of contract on behalf of CBI, and for fraud on behalf of TCW as a creditor; and (3) that TCW is not precluded from suing Ernst & Young under N.Y. Gen. Oblig. L. 15–108. The Court therefore vacates the judgment of the bankruptcy court with respect to the claims asserted by BSI on behalf of TCW in its role as a creditor.

The Court does not now resolve whether BSI has standing to sue Ernst & Young for fraud on behalf of CBI, or negligence on behalf of TCW as a creditor. Nor does the Court now resolve the other issues raised on appeal, some of which are rendered moot by the Court's conclusion that Ernst & Young is entitled to a jury trial with respect to TCW's claims.

The Court orders the parties to submit a proposed briefing schedule to address the question of whether the Court's conclusion that Ernst & Young is entitled to a jury trial with respect to TCW's claims necessi-

---

ered as a matter of standing, the bankruptcy court can make a determination of whether

the jury needs to decide any jurisdictional facts pertaining to standing.

tates a new trial on CBI's claims as well. The Court notes that the only briefing on this subject to date is contained in a single paragraph in Ernst & Young's reply brief. *See* Reply Brief of Appellants Ernst & Young, Ernst & Young LLP, at 5.

SO ORDERED.