In re PARAMOUNT HOTEL
CORP., Debtor.

In re Fred Gasthalter, Debtor.

Carl L. Finger, as Liquidating Trustee
of the Bankruptcy Estates of Para-
mount Hotel Corp. and Fred Gasthal-
ter, Plaintiffs,

v.

County of Sullivan Industrial Develop-
ment Agency, S.A.T. Catskill, Inc.,
Wann Lai Su, Tsai Shiu Kuan, Elmar
Associates LLC, Madison Park Inves-
tors LLC, Bellagio Family Settlement
Trust, BHY Funding, LLC and Enter
Equity, Inc., Defendants.

Bankruptcy Nos. 03–B–30117(CGM),
03–36155(CGM).
Adversary No. 04–9095(CGM).

United States Bankruptcy Court,
S.D. New York.

Jan. 19, 2005.

Alec P. Ostrow, Stevens & Lee, P.C., New York City, Gerald Orseck, Orseck Law Offices, Liberty, NY, for Debtors.

Marc Stuart Goldberg, M. Stuart Goldberg, LLC, White Plains, NY, Eric J. Small, Office of the United States Trustee, Albany, NY, for Trustee.

*MEMORANDUM DECISION ON MO-TION OF BHY FUNDING, LLC FOR AN ORDER EXTENDING ITS TIME TO ANSWER OR OTHER-WISE MOVE*

CECELIA MORRIS, Bankruptcy Judge.

By motion dated October 13, 2004, defendant BHY Funding, LLC ("*BHY*") requests an order extending its time to interpose an answer or otherwise move. BHY's motion is opposed by the plaintiff, Carl L. Finger, as Liquidating Trustee of the Debtors' estates under the Plans confirmed March 12, 2004 (the "*Liquidating Trustee*"). For the reasons set forth below, the Court will permit BHY's untimely an-

swer. Moreover, as described herein, the Court is conscious of and concerned about the prejudice resulting to unsecured creditors from delay in this litigation, and the Court will implement measures designed to avoid any further delay in resolving this adversary proceeding.

## BACKGROUND

Debtor Paramount Hotel Corp. ("*Paramount*") filed a Chapter 11 petition on May 15, 2003. Paramount's hotel business was destroyed by fire on October 16, 2000, and subsequent efforts to renovate the hotel were unsuccessful. Paramount's principal and shareholder, Fred Gasthalter, also filed a petition on the same day, and the cases were later jointly administered.

In the 10 months between filing and confirmation, the Debtors were constantly threatened with the loss of the majority of their assets to Wells Fargo, the senior secured creditor. The constant tension between the Debtors and Wells Fargo led to, among other things, disputes regarding the use of cash collateral, a motion for relief from the automatic stay, and a motion to convert the cases to Chapter 7. The Debtors were never able to make adequate protection payments to Wells Fargo, enter into a consensual cash collateral agreement or otherwise secure financing that would repay Wells Fargo.

### The Proposed Sale

Due to the Debtors' failure to obtain a dedicated financing facility that would "take out" Wells Fargo's senior secured position within the time prescribed by the Court in an order dated October 31, 2003, the right to market the Paramount Property passed to the joint control of the Official Committee of Unsecured Creditors (the "*Committee*") and Wells–Fargo by order dated November 5, 2003.

The Committee then undertook the arduous process of negotiating with Wells–Fargo, with the goal of capturing some of the value of the Debtors' assets for unsecured creditors. In late October 2003, the Debtors entered into an asset purchase agreement ("*APA*") with Wann Lai Su. The APA contemplated the sale of many of the estate properties, including the Paramount Hotel property and three parcels of real estate owned by Gasthalter. The Committee continued negotiations with Wann Lai Su, and the APA went through various amendments.

### The Rejected Retention of Enter Equity

Meanwhile, in January 2004, in connection with the proposed sale, the Debtors initially made a motion to retain Enter Equity as a real estate broker pursuant to a pre-petition agreement dated August 27, 2002. Under that agreement, Enter Equity would have received a commission of 6% on the closing of a sale with a purchase price of $10 million or less. The Committee responded with a host of objections, including that (i) the Committee and Wells Fargo had already retained their own broker, (ii) the Committee and Wells Fargo had exclusive right to market the property, and (iii) the application did not seek *nunc pro tunc* retention.

The Debtors then withdrew the Enter Equity retention application and sought approval of the same agreement as a "motion to assume," relying on its business judgment. The Debtors and Wann Lai Su also executed an amendment to the APA which provided that the commission to Enter Equity would be paid from the proceeds of sale. The Committee, Wells Fargo and United States Trustee each objected to the motion to assume and the proposed amendment. During the course of hearings on the motion to assume, it was suggested that the principal of Enter Equity and Wann Lai Su are relatives, and that in this and other respects Enter

Equity was not "disinterested." The United States Trustee's objection also noted that Enter Equity disclosed a relationship with Bella Farquar, a "former employee" of Paramount. The retention application also disclosed an intention to pay Farquar a "commission" of $20,000 if Enter Equity procured the sale. Thus, it appeared that Enter Equity was not a "disinterested person" as that term is defined in 11 U.S.C. § 101(14) and could not serve as a professional retained by the estate. The Debtors' motion to assume the agreement with Enter Equity was also withdrawn.

The Court repeatedly indicated that it would deny (i) the retention of Enter Equity as an estate professional, (ii) the assumption of any agreement with Enter Equity that would have the same effect, or (iii) payment of any of the proceeds of sale to Enter Equity under any theory. The bottom line has always been clear. Enter Equity is not a disinterested party, has never been retained in these bankruptcy cases, and was not authorized by this Court to receive a commission or payment of any kind from the estate or from property of the estate.

### Confirmation of the Chapter 11 Plans

Based on the APA, the Committee proposed plans in both cases, contemplating a closing no later than May 17, 2004, the latest date that Wells Fargo would consent to. The sale price was set at $5.25 million, with $2 million in cash to be paid at closing and the balance to be paid by a secured note. Because this would not generate enough cash at closing to satisfy secured claims, Wann Lai Su and the Committee amended the deal to provide for $4.25 million in cash at closing.

The Court confirmed plans in these cases on March 12, 2004, and the Liquidating Trustee (the Chair of the Committee) was appointed as disbursing agent. The plans and the contemplated sale represented a hard-fought victory for the unsecured creditors and the culmination of many disputes and difficult negotiations with an aggressive secured creditor, a non-operating, ineffective and at times obstructionist Debtor, and the assertion of bogus claims from entities such as Enter Equity that threatened to skim off any dividend to unsecured creditors.

### The Post–Default Amendment

Wann Lai Su failed to close on May 17, 2004 and was in default under the APA. The Liquidating Trustee and Wann Lai Su then negotiated a Post–Default Amendment to the APA. The Post–Default Amendment provided for (1) payment of $2,787,500 in cash at closing, of which $2,245,477 was to be paid to Wells Fargo, plus (2) a secured note for $1,200,000 due October 15, 2004. Thus, the total consideration at closing (after accounting for the deposit in the amount of $262,500) was to be $4.25 million, with $1.2 million of that amount to be paid over time, as opposed to the prior deal for $4.25 million in cash.

The Liquidating Trustee brought an emergency motion for approval of the Post–Default Amendment over the vehement objection of Wells Fargo. The Court approved the Post–Default Amendment by order dated June 9, 2004, with a concession to Wells Fargo: the parties were directed to close on June 15, 2004, with time of the essence. If a closing failed to occur by June 15, 2004, the sole right to market and sell the property would pass to Wells Fargo.

### Subsequent Events Leading to This Adversary Proceeding

The factual recitations in this section are drawn from the Liquidating Trustee's contentions in this adversary proceeding and should not be interpreted as findings of fact. As required under the Post–Default

Amendment and the Court's June 9, 2004 order, a closing occurred on June 15, 2004. The closing began at 10 a.m. on June 15, 2004. Wann Lai Su designated S.A.T. Catskill, Inc. ("*SAT*") as the purchaser by assignment. At 4:30 p.m., Wann Lai Su and SAT informed the Liquidating Trustee that they did not have sufficient cash to close. The only way that the closing could occur was if the Liquidating Trustee would forbear as to $263,555.07 that the Liquidating Trustee had expected to receive in cash at closing. As to that amount, the Liquidating Trustee would have to take a note and subordinate mortgage (the "*Forbearance Note*") in order to close before the deadline. Given the time constraints, the Liquidating Trustee agreed to accept the Forbearance Note, which he believed held a fourth mortgage position in the property, and was subordinate to no more than $3 million in senior debt.

The Liquidating Trustee alleges that he later learned that the Forbearance Note was subject to $3.5 million in senior debt, not $3 million, and that the Forbearance Note that the Liquidating Trustee received was actually a fifth mortgage. Although SAT incurred $3.5 million in debt the Liquidating Trustee believes that SAT only received $3 million in consideration. The Liquidating Trustee believes that Wann Lai Su and SAT did not have adequate cash to make the $263,555.07 payment at closing as the result of an alleged conspiracy between Enter Equity and BHY. The Liquidating Trustee alleges that BHY is a second-tier lender that intended to lend for only a three-month period. BHY allegedly advised Wann Lai Su and SAT at the closing that it would not meet its funding obligation to lend up to $1 million unless it received what the Liquidating Trustee asserts is "an unlawful and usurious up front flat fee" of $500,000 at closing. At the closing, BHY received a $755,000 mortgage from SAT (the "*BHY Mortgage*").

In addition, Enter Equity allegedly agreed to receive a check from BHY in the amount of $245,000 (an amount that approximates the commission it would have received on the $4.25 million sale at a rate of slightly less than 6%) and to then re-endorse the check to BHY; BHY then arranged for a $245,000 mortgage in BHY's favor but naming Enter Equity as a beneficiary and secured party (the "*Enter Equity Mortgage*"). The Enter Equity Mortgage was on par or senior to the BHY Mortgage. The $1 million owed under the BHY Mortgage and Enter Equity Mortgage was to be repaid to BHY by September 14, 2004.

### Relief Sought in the Adversary Proceeding

Based upon the above allegations, on September 2, 2004 the Liquidating Trustee commenced this adversary proceeding against SAT, Wann Lai Su, BHY, Enter Equity and five other defendants.

The Liquidating Trustee alleges that SAT extended $1 million in secured mortgage debt but realized only $500,000. If BHY extended only $500,000 for three months (at a nominal interest rate of 12%) and realized a $755,000 mortgage lien and note, SAT would have received less than a fair consideration, and the BHY Mortgage would be fraudulent as to the Debtors' estates, which are creditors of SAT. As for the Enter Equity Mortgage, SAT apparently received no consideration, and this would also be fraudulent as to the Debtors' estates.

The adversary proceeding seeks relief on the following eight causes of action:

— The first four counts seek avoidance of the BHY Mortgage and Enter Equity Mortgage as fraudulent to the Debtors' estates. In the first count, the Liquidating Trustee alleges constructive fraud under Section 273 of the New York

Debtor & Creditor Law ("*DCL*"). The second and third counts allege fraud under DCL Sections 274 (applicable to "Conveyances by persons in business") and 275 (applicable to "Conveyances by a person about to incur debts"), respectively. The fourth count seeks avoidance for actual fraud pursuant to DCL Section 276. Under each cause of action the Liquidating Trustee also seeks to preserve the avoided liens for the benefit of the Debtors' estates in accordance with Bankruptcy Code § 551 and DCL § 278.

— The fifth count seeks attorneys' fees pursuant to DCL Section 276–a, which are awarded where there has been an intentional fraudulent conveyance under DCL § 276.

— The sixth count seeks an order restraining SAT, Wann Lai Su and Tsai Shiu Kuan from making any payments under the BHY Mortgage or Enter Equity Mortgage or from assigning, disposing of, encumbering or secreting any "property properly subject to restraint in accordance with [DCL § 279]."

— The seventh count asserts that the BHY Mortgage and Enter Equity Mortgage are usurious pursuant to N.Y. General Obligations Law §§ 5–501 and 5–511 and the New York Penal Law § 190.40.

— The eighth count asserts causes of action against BHY and Enter Equity under the RICO statute, 18 U.S.C. § 1961 et seq., for fraud connected with a case under title 11. The Liquidating Trustee seeks damages under this count of no less than $1,463,555.07, with attorneys' fees, costs and treble damages in the amount of $4,390,665.21.

The Liquidating Trustee also alleges that BHY's conduct violated 18 U.S.C. § 152(5) and (6), which provides for punishment by fine and/or imprisonment for up to five years of any person who "knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11" or "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11."

On September 2, 2004 the Liquidating Trustee sought and obtained a temporary restraining order enjoining SAT, Wann Lai Su, Tsai Shiu Kuan, BHY and Enter Equity from "disposing of any property properly subject to restraint pursuant to [DCL] § 279(a) as made applicable by Fed.R.Civ.P. Rule 64, as incorporated by Fed.R.Bankr.P. Rule 7064." A preliminary injunction applicable to the same parties and acts was entered on September 8, 2004 and remains in effect pending the resolution of this adversary proceeding.

Each of the defendants was required to answer the complaint by October 4, 2004 unless the time to answer was extended. BHY failed to timely file an answer. On October 13, 2004 BHY filed the instant motion.

SAT, Wann Lai Su, Tsai Shiu Kuan and Enter Equity filed a joint answer, asserting a cross-claim against BHY for $495,000 in damages. BHY answered the cross-claim on October 27, 2004 and also asserted a cross-claim against SAT, Wann Lai Su, Tsai Shiu Kuan and Enter Equity.

### DISCUSSION

#### I. *Jurisdiction*

▮ The Liquidating Trustee alleges interference with the administration and liquidation of the assets of the estate and a delay in the implementation and consummation of the plan. The Liquidating Trus-

tee's allegations, if proven, would show that certain of the defendants to this adversary proceeding, including BHY, conspired to obtain a lien against estate assets that was equal or senior to the lien of creditors—for less than fair consideration—resulting in payment to those defendants prior to payment of creditors. Jurisdiction over BHY is proper because BHY is alleged to be the named mortgagee and the transferee and/or the transferor of a fraudulent conveyance of property in which the estate has an interest. Put another way, BHY and certain other defendants allegedly effected a fraudulent conveyance in the course of the sale of property of the estate. This constitutes interference with one of this Court's core proceedings. As explained below, the adversary proceeding contains both core claims and non-core "related" claims.

### A. This Court Retains Subject–Matter Jurisdiction

■ This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. "A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." *In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir.2002).

Moreover, the confirmed plans in these cases specifically provide that this Court will retain exclusive jurisdiction over various matters, including jurisdiction to hear and determine disputes arising in connection with the implementation of the plan, and to issue injunctions and enter any other orders that may be necessary to restrain interference by any entity with implementation or consummation of the plan. *See* Paramount Plan dated March 10, 2004, Article XIII; Gasthalter Plan dated March 10, 2004, Article XIII.

### B. Core Claims

■ This adversary proceeding contains causes of action that are unquestionably core proceedings under 28 U.S.C. § 157(b)(2)(A), (H) and (O). First, this matter directly concerns "the administration of the estate" under Section 157(b)(2)(A). Five of the eight causes of action are "proceedings to determine, avoid, or recover fraudulent conveyances," which are core proceedings under Section 157(b)(2)(H). Counts One through Six also affect "the liquidation of the assets of the estate" under Section 157(b)(2)(O).

### C. Related Claims

■ "A proceeding is considered to be at the core of the bankruptcy if it invokes a substantive right provided by title 11 or if it is a proceeding that, by nature, could arise only in the context of a bankruptcy case." *In re Keene Corp.*, 182 B.R. 379, 382 (S.D.N.Y.1995) (citation and internal quotations omitted). Count Seven (asserting state claims related to usury) and Count Eight (RICO claims) are not core claims. They do not arise from substantive rights provided by title 11, and they could arise in other, non-bankruptcy contexts. These causes of action are nevertheless "related" claims that accrued in favor of the Liquidating Trustee from the same set of facts as the core claims.

■ Pursuant to Section 28 U.S.C. § 157(c)(1), a bankruptcy court can hear non-core claims that are "otherwise related to a case under title 11." "Although the non-core issues must relate to the issues under title 11, non-core proceedings involve disputes over rights that have little or no relation to the Bankruptcy Code, do not arise under the federal bankruptcy law and would exist in the absence of a bank-

ruptcy case." *In re Keene Corp., supra,* 182 B.R. at 382. "In these related non-core matters, which are left undefined by the statute, bankruptcy courts may issue findings of fact and conclusions of law, but are not empowered to issue final orders. These factual findings and legal conclusions are then submitted to the district court to be reviewed *de novo.*" *Id.* at 382–83; 28 U.S.C. § 157(c).

### D. *Other Considerations*

■■■ BHY has not filed a proof of claim in these cases, and it may have the right to a jury trial even in core proceedings before this Court. *See, e.g., In re CBI Holding Co.,* 311 B.R. 350, 365 (S.D.N.Y.2004). Bankruptcy courts are authorized to conduct jury trials in core proceedings, but not non-core proceedings. *See In re Orion Pictures,* 4 F.3d 1095, 1101 (2d Cir.1993). A bankruptcy court "may still exercise non-core jurisdiction during the pre-trial phase if the proceeding is clearly a matter which is otherwise related to the bankruptcy proceeding." *In re Adelphia Comms. Corp.,* 2003 WL 21297258 at *2 (S.D.N.Y. June 4, 2003) (citations and internal quotations omitted) (denying withdrawal of reference in case asserting core claim for fraudulent conveyance and non-core RICO claims, allowing bankruptcy court to conduct pre-trial matters); *see also In re Formica Corp.,* 305 B.R. 147, 150 (S.D.N.Y.2004) ("In this case, proceeding in the bankruptcy court until trial will promote the interests of efficiency and economy consistent with the uniform administration of the bankruptcy laws."); *In re Wedtech Corp.,* 94 B.R. 293, 296 (S.D.N.Y.1988) (refusing to withdraw reference at pre-trial stage where bankruptcy judge was familiar with the present action; to do so "would defy logic, and be a gratuitous and unnecessary waste of judicial resources," whereas leaving the reference undisturbed presented a "unique and com-pelling opportunity to promote judicial economy and swift resolution, to the benefit of both parties"). Thus, unless an order withdrawing the reference is obtained from the district court, this Court will continue to oversee all pre-trial matters.

BHY has not moved to withdraw the reference, a motion that would be decided by the district court. *See* Fed. R. Bankr.P. 5011(a); Local Bankruptcy Rule 5011–1. Even when a motion to withdraw the reference is made, the decision to stay proceedings during the pendency of the motion is left to the bankruptcy court's discretion pursuant to Fed. R. Bankr.P. 5011(c).

## II. *Excusable Neglect Standards*

■■■ The Second Circuit's "preference that litigation disputes be resolved on the merits, not by default" is well known. *Cody v. Mello,* 59 F.3d 13, 15 (2d Cir.1995). A default judgment is "the most severe sanction which the court may apply." *Id.* (citations omitted).

In this case, no default was entered and no default judgment was sought or obtained; thus, the "excusable neglect" standard in Fed.R.Civ.P. 55(c), made applicable to these proceedings by Fed. R. Bankr.P. 7055, is not reached. However the same standard is contained in Fed. R. Bankr.P. 9006(b)(1), which permits the Court to enlarge the time to act after expiration of the originally specified time period "where the failure to act was the result of excusable neglect."

■■■ Whether BHY's time to answer should be extended for excusable neglect should be determined by reference to three criteria:

(1) whether the default was willful; (2) whether the defendant has a meritorious defense; and (3) the level of prejudice

that may occur to the nondefaulting party if relief is granted.

*Brien v. Kullman Indus., Inc.,* 71 F.3d 1073, 1077 (2d Cir.1995).

BHY explained that its failure to answer was due to the fact that BHY "was unable to retain counsel" until September 28, 2004 (a Tuesday), and because "[b]oth the principal of BHY, and its counsel, observe the Jewish holiday of Sukkoth, which begin [sic] this year on the evening of September 30, 2004, and concluded after sundown on October 8, 2004," nothing could be done either in the two-day period before the beginning of the holiday or until after October 8, 2004. BHY's counsel did contact the Liquidating Trustee on October 5, 2004 [1] to request an extension of BHY's time to answer (a request that was refused by the Liquidating Trustee). BHY's counsel did not apply to the Court for an extension on October 5, 2004.

The Court heard argument on BHY's motion both at a pre-trial conference on October 19, 2004, as well as the return date of BHY's motion, October 26, 2004. On October 19, 2004 the Court asked BHY to submit a proposed answer as proof of a meritorious defense. On October 26, 2004 the Court also requested the time records of BHY'S counsel. BHY submitted its proposed answer, which asserts 19 affirmative defenses, including challenges to the Court's subject-matter jurisdiction, and also demands a jury trial in district court. BHY also submitted the time records of its attorney, Barry Lichtenberg and the affirmations of two other individuals, Alan B. Hertz, the attorney who represented BHY at the June 12, 2004 closing, and Daniel Rokach, who claims to be a guarantor of

repayment of the mortgage and note from SAT to BHY.

Mr. Lichtenberg's time records indicate that he conducted a two-hour initial consultation with BHY on September 21, 2004. They did not meet again until September 28, 2004 when BHY retained him and at which time Mr. Lichtenberg performed .6 hours of work. No further work was performed on behalf of BHY (or any other client) until October 4, 2004, when one-half hour was billed. Mr. Lichtenberg billed a total of 1.8 hours on October 4, 2004, and 5.9 hours (of which 4.5 was on behalf of BHY) on October 5, 2004.

Mr. Hertz affirms that he was served with the complaint on September 7, 2004 and forwarded the papers to BHY with the advice that BHY seek other counsel because he is a real estate lawyer who is inexperienced in litigation and bankruptcy.

Mr. Rokach's affirmation describes in detail his efforts to assist BHY in obtaining counsel. He contacted 12 attorneys, including Mr. Lichtenberg. Mr. Rokach had several discussions with one attorney who ultimately advised him that he "did not have the time to go up to Poughkeepsie." Two other attorneys were contacted shortly before the Rosh Hashanah holiday and advised that they would not be able review the file until a few days after the holiday; they ultimately advised him to find an attorney closer to Poughkeepsie. Another attorney took more than a week to review the file.

 The first and, in this Court's view, most crucial consideration in this case is whether or not BHY's failure to answer was willful. A court should not set

---

1. In a November 18, 2004 letter to the Court, BHY's counsel clarified that "The annual Succoth Festival contains three segments," which are the "first days," "intermediate days" and "last days." While no work can be performed on the first days or last days, work such as the telephone call made by BHY's counsel to the Liquidating Trustee is permitted during the intermediate days, which included October 5, 2004.

aside a party's willful default. *Brien v. Kullman Indus., Inc.,* 71 F.3d at 1078. A default is willful "where the conduct of counsel or the litigant was egregious and was not satisfactorily explained." *SEC v. McNulty,* 137 F.3d 732, 738 (2d Cir.1998).

Under the circumstances of this case, BHY's failure to answer was not willful. The Affirmations submitted by Mr. Hertz and Mr. Rokach are persuasive. While this Court always gives the utmost deference to religious obligations of the parties and counsel before it, the better evidence in this case that BHY's failure to answer was not willful is BHY's good-faith effort to retain counsel. BHY and/or Mr. Rokach consulted at least a dozen attorneys, and in some instances waited several days for prospective attorneys to review the file.

The Court reiterates that its primary concern in this case is the prejudice that will accrue to unsecured creditors due to unnecessary delay. There is no doubt that unsecured creditors are prejudiced each day that this proceeding languishes. However, the Court does not believe that this is the sort of prejudice contemplated by the Second Circuit in determining whether or not default should be excused. BHY moved to extend the time to answer within 10 days after its answer was due and before default was noted on the docket or default judgment sought or entered. The Second Circuit's instruction is to consider "the level of prejudice that may occur to the nondefaulting party if relief is granted." *Brien v. Kullman Indus., Inc.,* 71 F.3d at 1077. In this case, prejudice to unsecured creditors is best addressed not by refusing to allow BHY to answer, but by ensuring that this action proceeds to trial as quickly and efficiently as possible.

As previously indicated, BHY has submitted a proposed answer that includes 19 affirmative defenses. Having concluded that BHY's default was not willful, the Court finds only that the proposed answer is not meritless.

### Conclusion

Given the foregoing facts and applicable Second Circuit law, BHY is permitted to file an untimely answer. This decision memorializes the Court's oral ruling on November 5, 2004.